UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Holly A. Zerrilla,

     Plaintiff,

        v.                            Civil Action No. 1:11-CV-191

Commissioner of Social Security,

     Defendant.

## REPORT AND RECOMMENDATION
(Docs. 6, 10)

Plaintiff Holly Zerrilla brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits.  Pending before the Court are Zerrilla's motion to reverse the Commissioner's

decision (Doc. 6), and the Commissioner's motion to affirm the same (Doc. 10).  For the

reasons stated below, I recommend that Zerrilla's motion be DENIED, and the

Commissioner's motion be GRANTED.

## Background

Zerrilla was forty-one years old on her alleged disability onset date of

January 1, 2007.  She attended school through the eleventh grade, received her GED, and

completed a two-year medical billing program.  (AR 233, 1205.)  She has worked as a

cashier, a doctor's assistant, a funeral attendant, a custodian, a laboratory assistant, a

retail clerk, a home health care worker, and a phlebotomist.  (AR 173.)

Zerrilla grew up in an abusive household. Her alcoholic father beat her starting at the age of six. (AR 405.) Her father also beat her mother, who in turn abused Zerrilla. (AR 1203, 1205.) Zerrilla's parents separated when she was nine years old; and approximately one year later, her father was murdered by his girlfriend. (AR 426.) In addition to experiencing parental abuse as a child, Zerrilla reported to providers that she was sexually abused by a male neighbor/babysitter. (AR 1205.)

The record demonstrates that Zerrilla's history of physically- and emotionally-abusive relationships continued into her adult life. (AR 232.) She has a son, but was never married. (AR 233, 437.) She has described her relationship with her son as "conflicted." (AR 726.) In 2008, Zerrilla moved from Florida to Vermont to care for her mother. (AR 426-27.) Soon thereafter, her mother sold her house and moved into a senior housing apartment. (AR 726.) At times, Zerrilla lived in that apartment with her mother, providing assistance to her; however, her mother regularly asked her to leave because she was not contributing financially. (*Id.*) On such occasions, Zerrilla lived in a tent until her mother allowed her to move back in with her. (*Id.*)

Zerrilla has a history of alcohol, marijuana, and cocaine abuse. (AR 313, 326, 726.) At some time prior to 2003, she attended a substance abuse treatment program but was unable to complete it. (*Id.*) In 2003, she overdosed on drugs. (AR 427, 1202, 1208.) During the alleged disability period, Zerrilla suffered from post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), major depressive disorder, anxiety, sleep problems, low self-esteem, chronic back pain due to degenerative spine disease, and chronic obstructive pulmonary disorder ("COPD").

On March 19, 2009, Zerrilla filed an application for disability insurance benefits. Therein, she alleged that, starting on January 1, 2007, she has been unable to work due to PTSD, ADHD, bipolar disorder, a thyroid disorder, COPD, and anxiety. (AR 172.) She further stated that she could not walk properly, and that "significant exertion could cause loss of breath[]." (*Id.*) Oddly, Zerrilla stated in her application that she stopped working on June 30, 2007, not because of her disabling impairments, but because she "was charged with [DWI] and [could not] get to work." (*Id.*) Zerrilla's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on January 13, 2011 by Administrative Law Judge ("ALJ") James D'Alessandro. (AR 24-39.) Zerrilla appeared and testified, and was represented by counsel. On February 22, 2011, the ALJ issued a decision finding that Zerrilla was not disabled under the Social Security Act from her alleged disability onset date through the date of the decision. (AR 8-16.) A few months later, the Decision Review Board notified Zerrilla that it had not completed its review of the claim during the time allowed, rendering the ALJ's decision the final decision of the Commissioner. (AR 1-3.) Having exhausted her administrative remedies, Zerrilla filed the Complaint in this action on July 28, 2011. (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ D'Alessandro first determined that Zerrilla had not engaged in substantial gainful activity since her alleged onset date of January 1, 2007. (AR 11.) At step two, the ALJ found that Zerrilla had the following severe impairments: degenerative changes of the lumbar spine, COPD, depression, anxiety, ADHD, and a history of polysubstance abuse. (*Id.*) At step three, the ALJ found that none of Zerrilla's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 12-13.) Next, the ALJ determined that Zerrilla had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that she was "limited to unskilled work and need[ed] to avoid exposure to environmental pollutants." (AR 13.) Given this RFC, as well as Zerrilla's age, education, and past work experience, the ALJ applied Rule 202.21 of the Medical-Vocational Guidelines as a framework for determining that Zerrilla could perform a significant number of other jobs existing in the national economy. (AR 15-16.) The ALJ concluded that Zerrilla had not been under a disability from the alleged onset date of January 1, 2007 through the date of the decision. (AR 16.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

5

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

**I.      Medical Equivalency to a Listed Impairment**

The ALJ found that Zerrilla's mental impairments, considered singly or in combination, did not meet or medically equal the criteria of Listings 12.04 and 12.06,

which pertain to affective disorders and anxiety-related disorders, respectively. (AR 12-13.) Zerrilla claims that this finding is not supported by substantial evidence, and that the ALJ did not consider the entirety of the record. Zerrilla specifically challenges the ALJ's ratings of her degrees of limitation in the areas of: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

The regulations provide that "[i]f the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the ['paragraph B'] criteria of the listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir.2008). Both Listings 12.04 and 12.06 require medically-documented findings that "[r]esult[] in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration . . . ." 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04(B), 12.06(B). As discussed below, I find that the ALJ properly considered each of these four functional areas, and that substantial evidence supports his assessments.

### A.     Activities of Daily Living

First, the ALJ found that Zerrilla had only "mild restriction" in activities of daily living. (AR 12.) The ALJ explained that Zerrilla had been able to live independently, travel, take public transportation, do laundry, manage her finances, advocate for her own medical treatment, and manage her own medication regimen. These were proper factors

for the ALJ to consider, given that the regulations provide that activities of daily living include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1).

The record supports the ALJ's findings. For example, the record demonstrates that Zerrilla prepared her own meals, did laundry and other chores, used public transportation, shopped for groceries, walked for two miles each day, and consistently appeared appropriate and well-groomed for medical and counseling appointments. (AR 35, 164-65, 413-19, 478-82, 651-62, 664-66, 728, 762, 846, 1049, 1058, 1197.) The record also reveals that Zerrilla took trips to Florida (AR 419, 427, 613, 683), cared for her ailing mother (AR 427, 727, 846, 1058), and managed a complicated medication regimen (AR 388-90, 613, 683, 677, 728). This evidence does not reflect an individual who had "marked" limitations in activities of daily living, even assuming, as Zerrilla claims, that she was kicked out of her living situation with her mother and periodically lived in a tent; that she required reminders to attend appointments, take medications, and do chores; and that she suffered anxiety when using public transportation.

### B. Social Functioning

Next, the ALJ determined that Zerrilla had "moderate difficulties" in social functioning. The regulations provide that social functioning "refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2). A claimant

may exhibit strength in social functioning "by such things as [his or her] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id.* The ALJ considered these factors in assessing Zerrilla's ability to function socially, stating as follows:

> The claimant has maintained relationships with friends as indicated through counseling records wherein she has reported traveling to visit friends, dating[,] and spending time with friends to celebrate holidays. [Zerrilla] has also reported that she spends time talking on the telephone to friends. Counseling records indicate that [Zerrilla] was consistently able to engage in treatment with appropriate eye contact, affect[,] and functioning.

(AR 12 (citations omitted).) The record supports this assessment. (*See, e.g.,* AR 419 (took trip to Florida, broke up with "partner"), 653 (planned to go to friend's house for four days), 660 (getting along better with mother, visited with friend in Barre), 1031 (participated in "match.com," went out on a date, tolerated crowds multiple times in past week, went out for dinner and drinks with friend and friends' co-workers), 1032 (spent holiday weekend with friend, attended friends' family holiday dinner, went out to socialize on two different days, went shopping at Salvation Army).) Although Zerrilla appears to have had some problems getting along with others, including her mother and her roommate at times, and although she has reported that she fears men, these facts do not require a finding that she is "markedly limited" in social functioning as opposed to merely moderately limited, as the ALJ found. The record simply does not reflect "marked" limitations in social functioning, such as "antagonistic, uncooperative, or hostile" conduct, which is the type contemplated by the regulations. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2).

Citing to *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000), Zerrilla argues that the ALJ should not have considered that she was able to conduct herself normally in a treatment setting in assessing her ability to function socially. But surely, the observations of Zerrilla's treating providers regarding whether she exhibited an appropriate appearance and affect during counseling and other appointments is relevant to an assessment of the severity of Zerrilla's social limitations for the purpose of determining if these limitations met the requirements of a listing. The Social Security Administration has explained that a determination regarding whether a claimant's impairments medically equal a listed impairment "must be based on medical evidence demonstrated by medically accepted clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary." SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds by* SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991). Moreover, as discussed above, the ALJ did not rely exclusively on Zerrilla's appearance and affect at medical appointments in determining that she had only moderate limitations in social functioning.

### C.     Concentration, Persistence, or Pace

Next, the ALJ found that Zerrilla had "moderate difficulties" in "concentration, persistence[,] or pace" (AR 12), which refers to a claimant's "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C) (3). In support of this finding, the ALJ accurately noted that, although Zerrilla complained of fatigue and loss of interest, she had been "able to manage her own

finances, use public transportation, manage her medications[,] and attend her treatment sessions." (AR 12-13 .) As discussed above, the record does in fact reflect that Zerrilla was able to manage a complicated medication regimen involving multiple medications of differing types and dosages. (*See, e.g.,* AR 398, 534, 566, 677, 809.) The ALJ also accurately noted that Zerrilla's counseling records indicate that she had "strengths with regard to punctuality, consistence[,] and organization." (AR 13 (citing AR 1206).) Treatment records also consistently reflect that Zerrilla's memory, attention, and concentration were within normal limits. (*See, e.g.,* AR 386, 391, 617, 757, 957.) This evidence supports the ALJ's assessment of moderate limitations in concentration, persistence, or pace.

Zerrilla asserts that the ALJ should have considered her ADHD diagnosis in the context of this assessment. But although the ALJ determined at step two that Zerrilla's ADHD was a severe impairment, neither that determination nor the mere diagnosis of the disorder requires a determination that such disorder meets a listing. *See Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988) ("it is not sufficient that there be a diagnosis of a listed impairment"). Zerrilla also claims that the ALJ should have considered her "consistent reports of an unrelenting inability to concentrate, sit still, or complete simple tasks like completing paperwork." (Doc. 6 at 8.) But the record, as discussed above, does not support these reports, instead documenting that Zerrilla had normal memory, attention, and concentration. (*See, e.g.,* AR 386, 391, 617, 757, 957.) Zerrilla further argues that, in assessing her concentration, persistence, or pace, the ALJ should have discussed the opinion of her treating nurse practitioner, Patricia Manion, APRN, that

Zerrilla would miss "about 4 days [of work] per month" due to her impairments. (AR 1027.) But a review of Manion's report indicates that her opinion that Zerrilla would miss approximately four days of work each month was not based on any deficiencies in Zerrilla's concentration, persistence, or pace. (*See* AR 1025-27.) Rather, Manion opined that Zerrilla would have no restrictions in understanding, remembering, and carrying out simple instructions; only mild restrictions in making judgments on simple work-related decisions; and only moderate restrictions in understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. (AR 1025.)

### D. Episodes of Decompensation

Finally, the ALJ determined that Zerrilla experienced no episodes of decompensation which had been of extended duration. (AR 13.) The regulations define episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). These occurrences "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* To qualify as "repeated episodes of decompensation, each of extended duration," evidence must show "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.*

In support of his assessment that Zerrilla had experienced no episodes of decompensation, the ALJ stated that Zerrilla "ha[d] not required any in-patient treatment since 2002" and "ha[d] been able to comply with her counseling and medication appointments." (AR 13.) Although Zerrilla claims that this assessment was inaccurate (*see* Doc. 6 at 8), the record supports the ALJ's findings. The only facts cited by Zerrilla in support of her claim that she experienced episodes of decompensation are that, for "a period [of time]," she was kicked out of her living situation, living in a tent, crying for days, and wishing a bus would run her over; for another period of time, she was experiencing suicidal ideations; and she had "multiple major depressive episodes and overwhelming anxiety where [she] at times describe[d] herself to be in a 'funk.'" (*Id.* at 9.) Zerrilla's periodic homelessness has little relevance in determining whether the regulatory definition of "episodes of decompensation" was met. Moreover, even assuming these facts are true, Zerrilla does not argue, and the record does not demonstrate, that any of these incidents were of "extended duration," as required by Listings 12.04 and 12.06. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). In fact, in at least one instance, after experiencing suicidal ideation, Zerrilla was "[f]eeling better" a few days later; and her counselor noted that, although she had been "very sad" and "cried through" much of her prior visit, and although she "still seem[ed] a littl[]e down," she "ha[d] more perspective and [could] see that she ha[d] options." (AR 524.)

For these reasons, I find no basis to disturb the ALJ's determination that Zerrilla's mental impairments, considered singly or in combination, did not meet or medically equal the criteria of Listings 12.04 and 12.06.

## II.    Credibility Determination

Next, Zerrilla argues that the ALJ improperly evaluated her credibility.  It is the

province of the Commissioner, not the reviewing court, to "appraise the credibility of

witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d

588, 591 (2d Cir. 1984).  If the Commissioner's findings are supported by substantial

evidence, the court must uphold the ALJ's decision to discount a claimant's subjective

complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701,

704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the

adjudicator must consider the entire case record and give specific reasons for the weight

given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (Jul. 2, 1996).

An important indicator of the credibility of a claimant's statements is their consistency

with other information in the record, including the claimant's medical treatment history.

*Id.* at *5, 7.

Here, the ALJ determined that Zerrilla's statements regarding the intensity,

persistence, and limiting effects of her symptoms "are not credible to the extent they are

inconsistent with the [ALJ's RFC] assessment."  (AR 14.)  This determination is

supported by several of the ALJ's specific findings.  For example, after summarizing

Zerrilla's testimony regarding her impairments, the ALJ accurately stated that, "[i]n

terms of [Zerrilla's] alleged problems with aggression towards others, . . . this has not

been described in any of [Zerrilla's] treatment records."  (AR 14.)  Rather, explained the

ALJ, Zerrilla had "consistently" been noted to be appropriate with her treatment

providers.  (*Id.* (citing AR 413-50).)  Likewise, regarding Zerrilla's asserted difficulty

getting out of bed a couple of times a month, the ALJ correctly stated that this had not been reported to treatment providers. (AR 14.) Zerrilla argues that "[t]here are numerous places within the record" which demonstrate that she had problems getting along with people and suffered from fatigue. (Doc. 6 at 11.) But the only evidence cited in support of this argument are Zerrilla's own direct statements or the recordings of her medical providers based on what Zerrilla reported to them. (*See* AR 382, 403, 404, 435, 437, 502, 523.) The ALJ is not obliged to accept without question the credibility of such subjective evidence. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (citations omitted).

In further support of her assertion that the ALJ erred in his credibility determination, Zerrilla argues that the ALJ should not have noted that Zerrilla "ha[d] been appropriate with her interactions with treatment providers" because "[a] stable condition at the doctor's office does not equate to proof of a mentally stable individual." (Doc. 6 at 11 (citing *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008).) But the ALJ did not rely on findings that Zerrilla was stable. Rather, as discussed earlier, the ALJ properly relied on the repeated observations of health care providers that Zerrilla was engaged and cooperative, and exhibited an appropriate appearance and affect. (*See, e.g.,* AR 413-19, 478-82, 651-62, 664-66, 1031.) The ALJ also noted in support of his credibility determination, that although Zerrilla complained of ADHD symptoms, she was able to work for long periods as a phlebotomist, and she was noted to have strengths in the areas of organization, consistency, and punctuality. (AR 14 (citing AR 182); *see also* AR 1206.) Furthermore, the ALJ considered Zerrilla's daily activities – including her ability to live on her own, advocate for her own financial and medical needs, do

laundry, travel, spend holidays with friends, and participate in a computer dating service – in determining that Zerrilla lacked credibility. (AR 15.) Without a doubt, an ALJ may consider a claimant's daily activities in assessing his or her credibility. *See, e.g., Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009) (citing 20 C.F.R. § 404.1529(c)(3)).

Zerrilla claims that the ALJ made several factual errors which affected his credibility determination. The record does not support this claim. Specifically, Zerrilla asserts that the ALJ inaccurately stated that she enjoyed walking, swimming, and biking, when in fact, "[w]hat [she] actually state[d] [wa]s that she used to enjoy walking, swimming, [and] biking before her mental condition interfered with th[ese] activities." (Doc. 6 at 12 (citing AR 166) (emphasis in original).) But in fact, the ALJ cited a document from the record in support of his assertion, and that document, which was prepared during the alleged disability period, does indeed state as follows: "Special Interests/Leisure/Recreation": "Walk, photography, read, swim, bike." (AR 1205; *see* AR 15.) Moreover, another document that was prepared during the alleged disability period states that Zerrilla had been doing "extra laundry and extra chores" and her hobbies included "walking approximately two miles per day." (AR 846.) Other counseling notes from the alleged disability period similarly record that Zerrilla's activities included walking. (*See, e.g.,* AR 520, 547, 790.)

## III.   Analysis of Treating "Other Source" Opinions

Next, Zerrilla asserts that the ALJ failed to properly consider the opinions of her treating medical sources, including Patricia Manion, APRN; Sarah Chase, LICSW,

CADC; Ellen Watson, FNP; Eva Kauppila, MSW, ASAC; and Andrea Solomon, PA-C.

Importantly, none of these medical sources was a physician, psychologist, or other

"acceptable medical source," as defined in the regulations. 20 C.F.R. § 404.1513(a).

Therefore, the ALJ was not required to evaluate these opinions in the same manner as

required under the treating physician rule. 20 C.F.R. § 404.1527(d)(2). Social Security

Ruling ("SSR") 06-03p explains that "only 'acceptable medical sources' can be

considered treating sources . . . whose medical opinions may be entitled to controlling

weight." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). "Acceptable medical

sources" are defined in the regulations to include licensed physicians, psychologists,

optometrists, podiatrists, and qualified speech-language pathologists, 20 C.F.R. §

404.1513(a), whereas sources such as nurse practitioners, physicians' assistants, and

therapists are defined as "other sources," 20 C.F.R. § 404.1513(d)(1). The Second

Circuit explained that, "while the ALJ is certainly free to consider the opinions of . . .

'other sources' in making his overall assessment of a claimant's impairments and residual

abilities, those opinions do not demand the same deference as those of a treating

physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citation omitted);

*see Duran v. Comm'r of Soc. Sec.*, 296 F. App'x 134, 136 (2d Cir. 2008) (finding no error

in ALJ decision to disregard assessment of "medical records physician" because it was

not from an acceptable medical source and did not include clinical findings).

Nonetheless, SSR 06-03p directs that opinions from "other sources" are

"important" and "should be evaluated on key issues such as impairment severity and

functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006

WL 2329939, at *3.  While the Commissioner is thus free to decide that the opinions of "other sources," including nurse practitioners like Manion and physicians' assistants like Solomon, are entitled to no weight or little weight, those decisions should be explained. *See Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (holding that opinion of "other source" is entitled to "some consideration").  Moreover, SSR 06-03p directs the Commissioner to use the same factors in evaluating the opinions of "other sources" as are used to evaluate the opinions of "acceptable medical sources."  SSR 06-03p, 2006 WL 2329939, at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  These factors include but are not limited to the length of the treatment relationship, the frequency of evaluation, and the degree to which the opinion is supported and consistent with the record. *Id.*; *see* 20 C.F.R. § 404.1527(c)(2).  The ALJ must be flexible in considering these factors, however, as "[n]ot every factor for weighing opinion evidence will apply in every case[, and t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case."  SSR 06-03p, 2006 WL 2329939, at *5.

The ALJ here analyzed the treating "other source" opinions in accordance with SSR 06-03p.  The ALJ acknowledged that various treating providers had completed statements supporting Zerrilla's claim, but accurately noted that "no treating or examining physician ha[d] described [Zerrilla] as disabled or as unable to work."  (AR 14.)  Although the ALJ could not have adopted the opinion of any one treating physician or other source on the "ultimate determination" of whether Zerrilla was disabled, 20 C.F.R. § 404.1527(e)(2)(i), it was appropriate for the ALJ to consider that none opined

that Zerrilla was disabled. The ALJ also accurately stated that Zerrilla's supporting treating providers, including "physician's assistants and nurse practitioners," were not "acceptable medical sources," but nonetheless afforded "some weight" to their opinions, to the extent they were consistent with the record and supportive of the ALJ's RFC determination. (*Id.*) The ALJ specifically cited the May 2010 letter opinion of physician's assistant Andrea Solomon, which stated that Zerrilla's PTSD, anxiety, and ADHD "prohibit[ed] her from working." (AR 914; *see* AR 14.) The ALJ correctly noted that Solomon "contrast[ingly]" stated in the same letter that Zerrilla's symptoms were "well[-]controlled." (*Id.*) The ALJ also cited the January 2011 opinion of physical therapist Chad Rainey that Zerrilla could sit for four hours at a time and walk at least two-to-three miles, observing that these activities were consistent with the ALJ's RFC determination. (AR 14-15 (citing AR 1069-75).)

Although the ALJ did not explicitly consider the opinion of nurse practitioner Patricia Manion, Zerrilla fails to state why the ALJ should have afforded more than "some weight" to this opinion. Moreover, much of Manion's opinion supports the ALJ's decision, including her assessments that Zerrilla would have no restrictions in understanding, remembering, and carrying out simple instructions; mild restrictions in making judgments on simple work-related decisions; and moderate restrictions in understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. (AR 1025.) Manion also assessed that Zerrilla was moderately limited in her abilities to interact appropriately with the public, supervisors, and co-workers; and that Zerrilla would miss "about 4 days [of work] per

month" due to her impairments. (AR 1026-26.) The record does not support these assessments, however, given Zerrilla's own reporting to treating providers that she traveled, spent holidays with friends, used a computer dating service, and went out on dates. (*See, e.g.,* AR 419, 427, 653, 655, 660, 1026-27, 1031-32, 1036.)

For these reasons, I find that the ALJ properly considered the opinions of Zerrilla's "other sources," and substantial evidence supports the ALJ's decision to afford only "some weight" to these opinions. Noteworthy, with the exception of Manion, it appears that none of the treating providers identified in Zerrilla's motion (Chase, Watson, Kauppila, and Solomon) rendered an opinion regarding the severity of Zerrilla's mental impairments or any resulting functional limitations. As the Commissioner points out, the ALJ cannot be charged with failing to evaluate opinions that do not exist. (*See* Doc. 10 at 23.)

## IV.     Step-Five Determination

Lastly, Zerrilla argues that the ALJ erred at step five of the sequential analysis by failing to specify any jobs that Zerrilla could perform, and by failing to employ the opinion of a vocational expert.

### A.     Jobs Zerrilla Could Perform

Because the ALJ determined at step four that Zerrilla had no past relevant work, the ALJ had the burden of proving at step five that Zerrilla retained "a residual functional capacity to perform alternative substantial gainful work which exist[ed] in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). The ALJ found that Zerrilla was a younger individual with a high school education who retained the RFC to

perform unskilled light work, but would need to avoid exposure to environmental pollutants. (AR 13, 15.) Explaining that Zerrilla's "additional limitations" – her inability to perform skilled work and the requirement that she avoid exposure to environmental pollutants – had "little or no effect on the occupational base of unskilled light work," the ALJ used Rule 202.21 of the Medical-Vocational Guidelines ("the Grids") as a "framework" to determine that Zerrilla was not disabled. (AR 16.) *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.21.

Relying on SSR 83-14, Zerrilla claims that the ALJ was required to cite examples of specific occupations that she could perform and the incidence of these jobs in the national economy. But "[t]he existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules; i.e., in promulgating the rules, administrative notice has been taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy, and very heavy) as supported by the 'Dictionary of Occupational Titles' . . . ." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b). Moreover, SSR 85-15 advises that "[t]he [Grids] reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their exertional capacities: approximately . . . 1,600 light and sedentary occupations; . . . representing numerous jobs in the national economy." SSR 85-15, 1985 WL 56857, at *1 (1985). Therefore, the ALJ was not required to cite examples of jobs Zerrilla could perform, or identify the incidence of these jobs in the economy.

## B.     Vocational Expert

The ALJ was also not required to use a vocational expert before finding that Zerrilla could perform work existing in the economy.  The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert."  *Bapp*, 802 F.2d at 603.  Rather, it is only in cases where "a claimant's nonexertional impairments significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the [Grids]" that the ALJ must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.  *Id.*  Here, as noted above, the ALJ determined that Zerrilla's additional limitations had "little or no effect on the occupational base of light work" (AR 16), and Zerrilla has failed to demonstrate otherwise.  Therefore, the ALJ was not required to consult a vocational expert.  *See Britt v. Astrue*, No. 11-2241-cv, 2012 WL 2331645, at *2 (2d Cir. 2012) (citing *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)); *cf. Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988) ("When a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations, the grids are inapplicable [and] . . . the [Commissioner] must take the testimony of a vocational expert and identify specific jobs within the claimant's capabilities.") (internal citations omitted).

## **Conclusion**

As explained above, Zerrilla has not demonstrated that the ALJ erred in his analysis. Significantly, there is no treating physician opinion in the record; thus, it was not error for the ALJ to have failed to consider any treating physician opinions. With respect to the opinions of "other sources," although the ALJ's explicit consideration of them was minimal, Zerrilla fails to point out any error. A review of the extensive record demonstrates that Zerrilla suffered from numerous mental impairments, some of them severe; but there is also substantial evidence to support the ALJ's determination that Zerrilla was able to work during the alleged disability period. A reviewing court must uphold the decision of the Commissioner where it is supported by substantial evidence, even in instances where the court may come to a different conclusion. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). The Second Circuit explained:

> On an appeal such as this, we are faced with a simple reality which appellants often overlook, namely, that factual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence. Congress has instructed us that the factual findings of the [Commissioner], if supported by substantial evidence, shall be conclusive. We would be derelict in our duties if we simply paid lip service to this rule, while shaping our holding to conform to our own interpretation of the evidence.

*Id.* (internal citations omitted). In this case, substantial evidence supports the ALJ's decision, and thus I recommend that Zerrilla's motion (Doc. 6) be DENIED, the Commissioner's motion (Doc. 10) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 6th day of July, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).